**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **VICKI TEETOR,** | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:15-CV-01002-HEA** |
| | ) | |
| **ROCK-TENN SERVICES,** | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S TRIAL BRIEF

COMES NOW Plaintiff, by and through counsel, and for her Trial Brief, states as follows:

## INTRODUCTION

Plaintiff suffers from Chronic Obstruction Pulmonary Disease (COPD), asthma, emphysema, and a paralyzed diaphragm.  Her conditions amount to a serious health condition under the Family and Medical Leave Act (FMLA) and a disability under the Americans with Disabilities Act (ADA) and the Missouri Human Rights Act (MHRA).  Plaintiff was fired during a job-protected leave of absence, in violation of the FMLA, ADA, and MHRA.  Likewise, Defendant failed to engage in the interactive process and failed to reasonably accommodate Plaintiff's disability, also in violation of the ADA and MHRA.  Finally, Defendant violated federal and Missouri wage laws by not providing Plaintiff with overtime pay for overtime hours that she worked.

Consistent with the above, Plaintiff's First Amended Complaint includes the following claims: (1) FMLA Interference; (2) FMLA Retaliation; (3) Failure to Accommodate under the ADA; (4) Disability Discrimination under the MHRA; (5) Failure to Accommodate under the MHRA; (6) Overtime Violations under the FLSA; and (7) Overtime Violations under the MMWL.

In this Trial Brief, Plaintiff will analyze the merits and applicable law of each of these claims in turn.

<u>**LEGAL ANALYSIS**</u>

**I.  PLAINTIFF WAS THE VICTIM OF FMLA INTERFERENCE AND RETALIATION**

The FMLA entitles an employee to twelve work-weeks of job-protected leave during any twelve-month period if she has a serious health condition that makes her unable to perform the functions of her position.  *Rynders v. Williams*, 650 F.3d 1188, 1195 (8th Cir. 2011); 29 U.S.C. §2612(a)(1)(D).  Likewise, an employee is entitled to such leave in order to care for a son or daughter if such son or daughter has a serious health condition.  29 U.S.C. §2612(a)(1)(C). A serious health condition "means any illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  29 U.S.C. §2611(11).  "There are two types of claims under the FMLA:  (1) interference ... claims in which the employee alleges than an employer denied or interfered with his substantive rights under the FMLA, and (2) retaliation … claims in which the employee alleges that the employer discriminated against him for exercising his FMLA rights.  *Rynders*, 650 F.3d at 1196, *quoting Phillips v. Matthews*, 547 F.3d 905, 909 (8th Cir. 2008).

**A.  Defendant Interfered With Plaintiff's Exercise of FMLA Rights.**

An employer is prohibited from interfering with, restraining, or denying an employee's exercise of or attempted exercise of any right contained in the FMLA.  29 U.S.C. §2615(a)(1); *see also Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006).  In an interference claim, an "employee must show only that he or she was entitled to the benefit denied."  *Stallings*, 447 F.3d at 1050, *quoting Russell v. N. Broward Hosp.*, 346 F.3d 1335, 1340

(11th Cir. 2003)(stating that the burden to establish an interference claim is less than that of a retaliation claim).  The Eighth Circuit has recognized that an employee can prove interference with an FMLA right regardless of the employer's intent.  *Stallings*, 447 F.3d at 1050.  The Eighth Circuit has rejected the application of the burden-shifting scheme in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), when analyzing an FMLA interference claim.  *Stallings*, 447 F.3d at fn. 3.

The FMLA forbids an employer from discharging an employee while she is on FMLA leave.  *Stallings*, 447 F.3d at 1050-51.  Defendant does not dispute that Plaintiff had a serious health condition.  In fact, Defendant granted Plaintiff's FMLA leave request at issue in this case, and it designated Plaintiff's FMLA leave as beginning on February 2, 2015 (that leave should have run through April 26, 2015).  However, Defendant sent Plaintiff a letter dated March 26, 2015 indicating that Plaintiff's employment had been terminated effective March 14, 2015.  There is no dispute that Plaintiff's employment was terminated before she received her full entitlement of FMLA leave.  Therefore, Defendant unlawfully interfered with Plaintiff's entitlement to FMLA leave.

## B.  Defendant Retaliated Against Plaintiff for Engaging in Protected Activity Under the FMLA

To establish a prima facie case of FMLA retaliation, an employee must show that:  (1) she engaged in activity protected under the Act; (2) she suffered an adverse employment action by the employer; and (3) a causal connection existed between the employee's action and the adverse employment action.[1]  *Darby v. Bratch*, 287 F.3d 673, 679 (8th Cir. 2002).  Defendant has not

---

[1] With regard to the "causal connection" element, a "motivating factor" causation standard and analysis (and not a "determining" or "but/for" standard/analysis) should be utilized at trial and in the Court's instructions to the jury. *See Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158 (2nd Cir. 2017)(holding that motivating factor causation standard, and not but/for standard, applies in FMLA retaliation cases).  *See also Stallings,* 447 F.3d at 1052-1053.

disputed elements (1) and (2). Defendant apparently intends to argue at trial, as it did in its summary judgment briefing, that there is no causal connection between the termination of Plaintiff's employment and Plaintiff's protected activity under the FMLA. More specifically, Plaintiff anticipates that Defendant will argue that Plaintiff's FMLA retaliation claim must fail because Defendant allegedly made the discharge decision before Plaintiff requested the FMLA leave at issue. This argument is flawed because it assumes incorrectly that Plaintiff's formal request for FMLA leave made on January 29, 2015 was the first time Plaintiff exercised rights under the FMLA. However, Plaintiff exercised FMLA rights before January 29, 2015, and before the date Defendant made the decision (on January 27, 2015) to terminate Plaintiff's employment.

Plaintiff exercised FMLA rights by missing time from work for health reasons that were covered by the FMLA, even though the absences were not treated by Defendant as FMLA-covered. For example, the record contains evidence that Plaintiff missed work on the following dates for reasons that were or may have been FMLA-covered reasons: July 18, 2014; July 21, 2014; July 24, 2014; July 28, 2014; July 30, 2014; July 31, 2014, August 1, 2014; August 4, 2014; August 27, 2014; October 21, 2014; October 22, 2014; October 23, 2014; October 24, 2014; December 1, 2014; January 16, 2015; January 23, 2015; January 26, 2015; January 27, 2015; January 28, 2015; and January 29, 2015. Plaintiff's medical condition began to worsen in June 2014, and continued to worsen throughout 2014. In October 2014, she missed several days of work due to her daughter's hospital stay for a serious health condition. Plaintiff visited the hospital on multiple occasions during July, August, and October 2014 for treatments related to her COPD. By December 2014, Plaintiff's lung issues were progressing quickly, and she was having trouble walking. Defendant was aware of Plaintiff's absences and the reasons for them. On January 26, 2015 (one day before Defendant made the decision to terminate Plaintiff),

at approximately 2:15 p.m., Plaintiff spoke with Sean Vigna in person about having problems with her lungs and with breathing, and that she was going to have to leave work early because of these issues; immediately after that conversation, Plaintiff left the office for the day.  On January 27, 2015, at 5:15 a.m., Plaintiff sent Vigna an email stating, "I am having some breathing issues, I am staying home and contacting physician as soon as office opens," and Plaintiff was out of work that day.  (PSMF ¶¶ 80-81.)  Later that same day, Vigna made the decision to terminate Plaintiff.

Defendant fundamentally misunderstands how the FMLA works.  As Sean Vigna indicated in his deposition, Defendant considers a particular work absence to be FMLA-covered only if the employee specifically (formally) applies for FMLA leave.  Stated differently, Defendant does not count <u>any</u> absence as FMLA-covered unless an employee formally applies for FMLA leave.[2]  The problem with Defendant's approach is that it prevents FMLA designation for situations where an employee misses work and alerts the company to an FMLA-qualifying reason for leave, but does not specifically (and formally) "apply" for FMLA leave.  Under the law, an employee provides adequate notice of the need for FMLA leave "when the employee provides enough information to put the employer on notice that the employee may be in need of FMLA leave." *Rynders*, 650 F.3d at 1196, *quoting Thorson v. Gemini, Inc.*, 205 F.3d 370, 381 (8th Cir. 2000).  Indeed, the Eighth Circuit has characterized the FMLA regulations as "generous to employees." *Rask v. Fresenius Medical Care*, 509 F.3d 466, 471 (8th Cir. 2007).  The employee is not required to mention the FMLA when requesting leave, but may simply state that leave is needed.  29 C.F.R. §825.303; *Rask*, 509 F.3d at 472.  An employee is not required to provide all of the details necessary to show she was entitled to FMLA leave; the employee is only required to provide information sufficient

---

[2] Not surprisingly, Vigna testified in his deposition that he has not received any training on how to administer FMLA leave, and he admitted that he was only "vaguely familiar" with Defendant's written FMLA policy.

5

to inform the employer that she <u>may be</u> entitled to FMLA leave. *Ruble v. Am. River Transp. Co.*, 799 F.Supp.2d 1017, 1025 *citing Phillips*, 547 F.3d at 909. Once it has such minimal notice, the employer is obligated under the FMLA to conduct further inquiry and investigation, such as requesting a medical certification, to determine whether the requested leave in fact qualifies as FMLA leave. *Spangler v. Federal Home Loan Bank*, 278 F.3d 847, 853 (8th Cir. 2002); 29 C.F.R. §825.302(c). Eighth Circuit case law instructs that "the adequacy of an employee's notice requires consideration of the totality of the circumstances and is typically a jury question." *Id.*, *quoting Murphy v. FedEx Nat'l LTL, Inc.*, 618 F.3d 893, 903 (8th Cir. 2010). Defendant's interpretation of the FMLA eviscerates the entire purpose of the law, and places burdens on an employee that are completely imaginary.

For the dates listed above, Plaintiff provided sufficient information to inform Defendant that she <u>may be</u> entitled to FMLA leave. Defendant received enough notice from Plaintiff in order to trigger Defendant's obligation under the FMLA to conduct further inquiry and investigation. Defendant failed to fulfill that obligation. While Plaintiff did not formally "apply" for FMLA with regard to all of her FMLA-related absences, she did not need to do so in order for the absences to be covered. Once Plaintiff provided information sufficient to inform Defendant that she may be entitled to FMLA leave, from that point on it was up to Defendant to designate the leave as FMLA-covered. *See* 29 C.F.R. §825.301(a) (setting forth employer responsibilities for designating FMLA leave). Plaintiff engaged in activity protected by the FMLA by being absent from work on the above-referenced dates and by informing her employer of the underlying medical reasons for the absences. The fact that Defendant failed to designate those absences as FMLA-covered does not turn protected activity into unprotected activity.

6

While Defendant may claim to have made a decision to terminate Plaintiff based on performance, the timing of when the termination decision was communicated to Plaintiff destroys any link to Plaintiff's job performance.  While it is undisputed that the decision to terminate Plaintiff was made on January 27, 2015, Plaintiff was not actually terminated until March 26, 2015. As of that date, Plaintiff was out on medical leave and had not exhausted her available FMLA leave.  In the termination letter, Hammell stated that Plaintiff's FMLA claim had been denied on March 13, 2015 due to a lack of supporting medical documentation (a determination that was not correct and was, in fact, later reversed).  Hammell saw the temporary (yet legally incorrect) denial of Plaintiff's FMLA leave request as a window of opportunity to fire an employee that she personally did not deem worthy of FMLA benefits.  Clearly, it was Plaintiff's leave scenario and status that were driving Plaintiff's termination (and the timing thereof), rather than Plaintiff's job performance.

In addition, there is significant evidence that Vigna and other managerial employees of Defendant harbored a negative animus towards Plaintiff because of her medical-related absences, which sheds light on Vigna's motivation for terminating Plaintiff.  In his deposition, Vigna admitted he was aware that Plaintiff's medical problems were related to lung issues which were serious enough for her to miss substantial time from work, and admitted to being frustrated with Plaintiff because she was missing work for medical reasons.  On multiple occasions, Vigna counseled Plaintiff about her absenteeism, and specifically told Plaintiff that it "hurts the team" when Plaintiff takes off work, and that he wanted to see fewer absences from Plaintiff.  Plaintiff testified in her deposition that in July, October, November, and December 2014, Vigna expressed negativity towards her due to her absences.  Plaintiff testified that Vigna was treating her less favorably because of her medical conditions, that Vigna was upset with her because of her

disability-related absences, and that she talked to Diane Hoffmeyer (a Rock-Tenn employee) about being mistreated by Vigna due to her disability in October 2014.  Plaintiff testified in her deposition that Vigna was upset about absences tied to her disability.

Defendant's managers made numerous statements about Plaintiff after the termination decision was made that shed light on Defendant's negative, unlawful animus towards Plaintiff's legal rights.  Upon seeing Plaintiff's formal medical leave request come through, Vigna admitted that he did not want to mess with having to deal with Plaintiff's medical leave; rather, he wanted to fire her.  Subsequently, Defendant's managers began emailing each other (and an outside party) to badmouth Plaintiff and the fact that she had formally requested FMLA leave.  Carol Hammell forwarded Plaintiff's FMLA leave request to Vigna and Paul MacDonald and wrote, "WOW Incredible," to which MacDonald responded, "I'm assuming there is not much we can do about this?"  In response to MacDonald's email, Hammell wrote an email to MacDonald and Vigna in which she expressed her desire that Plaintiff would not obtain FMLA coverage:

> I am hoping that [Plaintiff] will not be able to substantiate a true medical condition in which case this will be denied.  Let's wait and see.
>
> The BSC and Aon Hewitt as you know approves most things—but I will keep a close eye on this case and call them out if I think they are rubber stamping something that should not be.

Hammell testified in her deposition that she did not "believe" that Plaintiff had a serious medical condition that necessitated FMLA leave because, according to Hammell, Plaintiff had a history of chronic attendance issues.  Vigna testified that he is in agreement with what Hammell wrote in her email.

Vigna also forwarded the email notification he received regarding Plaintiff's FMLA leave request to Quade Wood, who is Vigna's brother-in-law and is not an employee of Defendant.  After Vigna forwarded the email notification to Wood, Vigna and Wood engaged in dialogue during

which Vigna was bragging (taking glee) about firing Plaintiff.  When Plaintiff was advised (incorrectly) in March 2015 that her leave of absence was no longer covered by the FMLA, Plaintiff undertook efforts to communicate with Defendant to try to extend her leave of absence and keep her job; she sent an email indicating that she was appealing the denial of the continuation of FMLA and short-term disability coverage, and further requesting to use vacation days while the appeal was pending so that Plaintiff's existing coverage did not lapse.  In response to Plaintiff's request, Vigna (in an email to MacDonald) mocked Plaintiff, stating "Wow, that e-mail from Vicki had to get some laughs."  Vigna admitted in his deposition that the email was inappropriate and disrespectful of Plaintiff.  The foregoing facts do not represent the behavior or actions of managers who are making lawful decisions.  Rather, they demonstrate unlawful motives and a complete disregard for Plaintiff's legal rights.

## II.    DEFENDANT FAILED TO ACCOMMODATE PLAINTIFF'S DISABILITY IN VIOLATION OF THE ADA

In this case, Plaintiff's claim under the ADA is a failure to accommodate claim (Count VII of the First Amended Complaint).  In a reasonable accommodation case, the "discrimination" is "framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations," as required by the ADA. *Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004).  In order to determine whether an accommodation is necessary and, if so, what that accommodation may be, the employer and employee must engage in the "interactive process." *Peyton v. Fred's Stores of Ark., Inc.*, 561 F.3d 900, 903 (8th Cir. 2009).  "To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of accommodation.  This process should identify those precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."

9

29 C.F.R. §1630.2(o)(3). A covered entity is required, absent undue hardship, to provide a reasonable accommodation to an otherwise qualified individual with a disability. 29 C.F.R. §1630.2(o)(4). The Eighth Circuit also has recognized that the failure of an employer to engage in the interactive process to determine whether reasonable accommodations are possible is prima facie evidence that the employer may be acting in bad faith. *Orr v. City of Rogers*, 2017 U.S. Dist. LEXIS 15306, *42 (W.D. Ark. Feb. 3, 2017), citing *Fjellestad v. Pizza Hut of Am. Inc*., 188 F.3d 944, 952 (8th Circ. 1999).

In the present case, Defendant failed to engage in the interactive process with Plaintiff. Once an employer knows of an employee's disability and the employee has requested accommodation, the employer's obligation to participate in the interactive process has been triggered. *Fjellestad*, 188 F.3d at 948. While Plaintiff was on FMLA leave between early February and late March 2015, Plaintiff was told by Defendant's third-party disability administrator (Defendant's agent) that she was allowed to communicate only with Defendant's disability third-party administrator and that she was not allowed to communicate directly with Rock-Tenn regarding any accommodation issues. While she was on FMLA leave and prior to the termination of her employment, Plaintiff communicated with a representative of Defendant's disability administrator and, in that communication, Plaintiff stated that she would like to have the opportunity to work from home. Also, following the initial denial of her FMLA and short-term disability leave requests in March 2015, Plaintiff requested another accommodation from Defendant in the form of additional leave. Plaintiff's requests for accommodation triggered Defendant's obligation to engage in the interactive process with Plaintiff. Defendant did not engage in that process. Plaintiff testified in her deposition that no one from Rock-Tenn contacted her to discuss accommodations of her disability, and that Defendant did not offer Plaintiff the

ability to work from home.  Paul MacDonald, Sean Vigna, and Carol Hammell all testified that they are not aware of anyone from Rock-Tenn communicating with Plaintiff about potential work-related accommodations (such as working remotely from home).  Ironically, in Plaintiff's termination letter, Hammell made the statement, "Rock Tenn has no reason to believe that your leave of absence requires continued accommodation."  Defendant cannot bury its head in the sand, ignore its legal obligation to engage in the interactive process with Plaintiff, and then take the position that Plaintiff could not be accommodated.  In *Fjellestad*, the Eighth Circuit stated:

> The interactive process, as its name implies, requires the employer to take some initiative…  The interactive process would have little meaning if it was interpreted to allow employers, in the face of a request for accommodation, simply to sit back passively, offer nothing, and then, in post-termination litigation, try to knock down every specific accommodation as too burdensome.  That's not the proactive process intended:  it does not help avoid litigation by bringing the parties to a negotiated settlement, and it unfairly exploits the employee's comparative lack of information about what accommodations the employer might allow.

188 F.3d at 953, *quoting Taylor v. Phoenixville Sch. Dist.*, 174 F.3d 142, 161 (3rd Cir. 1999.)

Defendant likely will argue at trial that allowing Plaintiff to work from home is not reasonable because in-person attendance was an essential function of the Market Analyst position.  This position is contradicted by the facts of this case.  Clearly, it was possible for Plaintiff to perform her job duties at home, and this is not merely a hypothetical statement.  Plaintiff in fact performed her duties while working from home for a two-year period of time, and working from home did not present any problems with Plaintiff's ability to perform her duties for Defendant.  During that time period, Plaintiff received positive performance reviews, and was not less productive or efficient as compared to when she worked out of Defendant's office location.  The argument that it is an "undue hardship" to allow a work practice that it followed for a two-year period is not credible.  *See Pinegar v. Shinseki*, 665 F.Supp.2d 487, 500-501 (M.D. Pa. 2009)(the fact that plaintiff previously worked successfully from home suggests that working from home

11

might be a reasonable accommodation).  Indeed, it is well established that under the ADA, allowing an employee to work from home can be a reasonable accommodation.[3]  Undue hardship is an affirmative defense on which Defendant bears the burden of proof.  *Fenney v. Dakota, Minn. & R.R. Co.,* 327 F.3d 707, 711 (8th Cir. 2002)(employer required to demonstrate that an accommodation would impose an undue hardship); *Smith v. Midland Brake, Inc*., 180 F.3d 1154, 1179 (10th Cir. 1999); *Vande Zande v. Wisconsin Dep't of Admin*., 44 F.3d 538, 542 (7th Cir. 1995.  In determining whether an accommodation would impose an undue hardship on an employer, factors to be considered include:

> (1) the nature and net cost of the accommodation needed, taking into consideration the availability of tax credits and deductions, and/or outside funding; (2) the overall financial resources of the facility or facility or facilities involved in the provision of the reasonable accommodation, the number of persons employed at such facility, and the effect on expenses and resources; (3) the overall financial resources of the covered entity, the overall size of the business of the covered entity with respect to the number of its employees, and the number, type and location of its facilities; (4) the type of operation or operations of the covered entity, including the composition, structure and functions of the workforce of such entity, and the geographic separateness and administrative or fiscal relationship of the facility or facilities in question to the covered entity; and (5) the impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business.

29 C.F.R. 1630.2(p).

---

[3] *See, e.g., Rezvan v. Philips Elecs. N. Am. Corp*., 2016 U.S. Dist. LEXIS 173734 (N.D. Cal. Dec. 15, 2016); *Miles v. Northcott Hospitality Int'l, LLC*, 963 F.Supp.2d 878, 898 (D. Minn. 2013); *Moebius v. TharpeRobbins Co.*, 2016 U.S. Dist. LEXIS 151236, *41 (D. Mass. Nov. 2, 2016); *Norris v. Allied-Sysco Food Servs*., 948 F.Supp. 1418, 1438 (N.D. Cal. 1996); *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99 (2nd Cir. 2010); *Willinghan v. Town of Stonington*, 847 F.Supp.2d 164, 189; *Bixby v. JP Morgan Chase Bank, N.A*., 2012 U.S. Dist. LEXIS 32974, *33 (N.D. Ill. Mar. 8, 2012).

Given the prior history of Plaintiff working remotely from home, and the fact that the essential functions of her job can unquestionably be performed from home, Defendant cannot meet its burden on the "undue hardship" defense.[4]

## III.    DEFENDANT DISCRIMINATED AGAINST, AND FAILED TO ACCOMMODATE, PLAINTIFF IN VIOLATION OF THE MHRA

### A.  Plaintiff Was Subjected to Disability Discrimination Under the MHRA

Missouri Approved Instruction (MAI) 38.01(A) (formerly MAI 31.24) sets forth the basic elements for submission of an MHRA claim to a jury as follows: (1) defendant discharged plaintiff; (2) disability was a contributing factor in such discharge; and (3) as a direct result of such conduct, plaintiff sustained damage.  *Lomax v. DaimlerChrysler Corp*., 243 S.W.3d 474, 479 (Mo. App. E.D. 2007); MAI 38.01(A) (2012 Revision)(emphasis added).    Crucially, the MHRA's "contributing factor" standard is "less rigorous than the 'motivating factor' standard employed in federal discrimination cases." *Lomax v. DaimlerChrysler Corp.*, 243 S.W.3d 474, 482 (Mo. Ct. App. 2007).  A "contributing factor" is merely a condition that "contributes a share in anything or has a part in producing the effect."  *Id*.

Plaintiff expects that Defendant will argue that Plaintiff was not disabled within the meaning of the applicable law because her medical condition interfered with her ability to perform the essential functions of her job, and that her request for additional time off constituted a request

---

[4] To the extent Defendant intends to argue that Plaintiff's applications for disability benefits should lead to the conclusion that she cannot perform the essential functions of her job, this argument is not consistent with the law.  *See., e.g., Cleveland v. Policy Mgmt. Sys. Corp*., 526 U.S. 795, 797-8 (1999)(holding that the pursuit, and receipt, of disability benefits does not automatically estop the recipient from pursuing an ADA claim, nor does the law erect a strong presumption against the recipient's success under the ADA); *Finan v. Good Earth Tools, Inc.,* 565 F.3d 1076, 5-6 (8th Cir. 2009)(plaintiff's receipt of private and Social Security disability benefits did not bar ADA claim); *Huggard v. United Performance Metals, Inc.*, 2011 U.S. Dist. LEXIS 151276 (S.D. Ohio Nov. 17, 2011).

for an undefined (and therefore unreasonable) leave of absence.  In *Lomax*, the defendant made a similar argument, and also argued that the plaintiff was estopped from claiming that he should have been reasonably accommodated because he was receiving Social Security and long-term disability benefits on the basis of his inability to work.  243 S.W.3d at 481.  The court held that "an indefinite leave might be permissible under certain circumstances."  *Id*. at 481.  Also, the court rejected the defendant's estoppel argument, holding that "we do not believe that Mr. Lomax's receipt of Social Security and/or long-term disability benefits precludes a determination that he is covered under the MHRA."  *Id*. at 482.

In this case, there is ample evidence that Plaintiff's disability was a contributing factor in Plaintiff's termination.  This evidence is voluminous, and Plaintiff will not restate all of the supporting facts here (indeed, much of this evidence overlaps with the facts illuminating Defendant's retaliatory actions against Plaintiff in violation of the FMLA and are referenced above).  Many of the facts that will be presented to the jury on this issue can also be found in Plaintiff's Statement of Additional Material Facts (part of her briefing in opposition to Defendant's summary judgment motion). *See* ECF Doc. No. 61, ¶¶ 28-52, 75-98, 111-127.

### B.  Plaintiff Has a Valid Claim for Failure to Accommodate Under the MHRA

With regard to Plaintiff's MHRA failure to accommodate claim, much of the necessary analysis is already set forth above in the ADA failure to accommodate section.  However, in addition to those issues, Plaintiff anticipates that Defendant may continue to argue (as it did in its summary judgment briefing) that the MHRA does not recognize a claim based on the failure to accommodate a disability.  In fact, the regulations interpreting the MHRA indicate that an employer has an affirmative duty to provide a reasonable accommodation:  "An employer shall make reasonable accommodation to the known limitations of a handicapped employee or

14

applicant."  8 C.S.R. 60-3.060(1)(G)(1); *see also Lomax*, 243 S.W.3d at 480 (under the MHRA, employer has affirmative duty to reasonably accommodate an employee's handicap).  The MHRA prohibits unlawful discrimination based on disability, and in this case, Defendant committed two separate and distinct acts of unlawful discrimination: (1) discrimination in the form of a failure to provide a reasonable accommodation; and (2) discrimination in the form of terminating Plaintiff because of her disability.

The prima facie elements of an MHRA failure to accommodate claim are: (1) Plaintiff requested an accommodation for her disability or it was otherwise clear that she might need it; and (2) Defendant failed to provide a reasonable accommodation that would have enabled her to perform the essential functions of her job. *Welshans v. Boatman's Bancshares*, 872 S.W.2d 489 (Mo. App. E.D. 1994).   Missouri courts have held that, when an employee with a disability informs the employer of her limitations, the employer has a duty, even without any request by the employee for accommodation, to consider accommodations that would enable her to perform her job.  "[Plaintiff's] condition was known to the respondent and his failure to request reasonable accommodation does not require that [plaintiff's] evidence of accommodation be disregarded." *Welshans,* 872 S.W.2d at 494.   The *Lomax* court noted that the denial of a reasonable accommodation may "tend to prove that the employer also acted adversely against the employee because of the individual's disability."  243 S.W.3d at 480, *citing Kells v. Sinclair Buick-GMC Truck, Inc*., 210 F.3d 827, 833-34 (8th Cir. 2000).

## IV.    PLAINTIFF WORKED OVERTIME HOURS WITHOUT APPROPRIATE PAY, AND WAS NOT EXEMPT FROM THE OVERTIME PROVISIONS OF THE FLSA/MMWL[5]

Under the FLSA, non-exempt employees are entitled to additional hourly pay for every hour worked above forty during the workweek.  29 U.S.C. §207.  Based on the deposition testimony in this case, there should be no dispute that Plaintiff worked in excess of forty hours in one or more workweeks and that she did not receive additional wages for her overtime work. Plaintiff was entitled to overtime pay unless an exemption applied.  *Beauford v. ActionLink*, LLC, 781 F.3d 396, 401 (8th Cir. 2015); 29 U.S.C. §§207(a)(1), 213(a)(1).  Defendant bears the burden to demonstrate its affirmative defense that Plaintiff was exempt from the FLSA's overtime requirements.  *Beauford*, 781 F.3d at 401, *citing Fife v. Harmson*, 171 F.3d 1173, 1174 (8th Cir. 1999).  The Eighth Circuit has stated that "[w]e protect workers by narrowly construing exemptions to the FLSA's overtime requirements."  *Beauford*, 781 F.3d at 401; *see also Donovan v. Bereuter's, Inc*., 704 F.2d 1034, 1036 (8th Cir. 1983)(FLSA exemptions "ought to be applied only in those circumstances which plainly and unmistakably come within their terms and spirit").

Defendant intends to argue that Plaintiff was exempt from the overtime provisions of the FLSA and MMWL via the administrative exemption.[6]  An Eighth Circuit Model Jury Instruction sets out the elements of the administrative employee exemption for the jury's consideration. *See* 8TH CIR. CIVIL JURY INSTR. § 16.61 (2017).  Because Plaintiff was not employed in a "bona fide administrative capacity" as defined by the FLSA and its regulations, Defendant cannot meet

---

[5] As discussed more fully in Plaintiff's Motion in Limine, Defendant did not respond to written discovery requesting disclosure of facts that support its exemption defenses.  Therefore, the Court should exclude any exemption defenses at trial, whether in the form of evidence, argument, or jury instructions.

[6] The MMWL incorporates exemptions that apply under the FLSA.  *See* Section 290.505(3)-(4) R.S.Mo.

its burden of proof on its affirmative defense, and Plaintiff is entitled to damages for Defendant's

FLSA and MMWL violations.

For purposes of the exemption claimed by Defendant, an employee employed in a

"bona fide administrative capacity" is an employee:

(1)    Compensated on a salary or fee basis at a rate of not less than $455 per
       week…;

(2)    Whose primary duty is the performance of office or non-manual work
       directly related to the management or general business operations of the
       employer or the employer's customers; and

(3)    Whose primary duty includes the exercise of discretion and independent
       judgment with respect to matters of significance.

29 C.F.R. §541.200.  As explained below, Defendant cannot satisfy elements (2) or (3).

### A. Plaintiff's Primary Duty Was NOT the Performance of Office or Non-Manual Work Directly Related to the Management or General Business Operations of the Employer or the Employer's Customers[7]

The FLSA regulations set forth the types of jobs that fall within the definition of work

"directly related to the management or general business operations of the employer or the

employer's customers":

Work directly related to management or general business operations includes, but
is not limited to, work in functional areas such as tax; finance; accounting;
budgeting; auditing; insurance; quality control; purchasing; procurement;
advertising; marketing; research; safety and health; personnel management; human
resources; employee benefits; labor relations; public relations; government
relations; computer network, internet and database administration; legal and
regulatory compliance; and similar activities.

29 C.F.R. §541.201(b).  The phrase "directly related to the management or general business

operations" refers to the type of work performed by the employee.  29 C.F.R. §541.201(a).

To meet this requirement, an employee must perform work directly related to assisting with the

---

[7] Defendant concedes that Plaintiff did not perform work directly related to the management or
general business operations of Defendant's customers.  (ECF Doc. No. 55, SUMF ¶289; ECF Doc.
No. 55.5; ¶43).

17

running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment. *Id*. The regulations distinguish between work "directly related to the management or general business operations" (which is exempt work) and production functions (which is non-exempt work). 5 C.F.R. §551.206.

In *Koehler v. Freightquote.com, Inc*., 2015 U.S. Dist. LEXIS 89691 (D. Kan. July 10, 2015), the court analyzed the FLSA administrative exemption in the context of employees in the logistics field that performed job duties very similar to those of Plaintiff. The court drew an "important distinction" between employees directly producing the good or service that is the primary output of a business and employees performing general administrative work that applies to the running of a business. *Id*. at *47, *citing Davis v. J.P. Morgan Chase & Co*., 587 F.3d 529, 535 (2nd Cir. 2009). "The administration/production distinction thus distinguishes between work related to the goods and services which constitute the business' marketplace offerings and work which contributes to 'running the business itself.'" *Koehler*, at *47, *quoting Schaefer-LaRose v. Eli Lilly & Co*., 679 F.3d 560, 574 (7th Cir. 2012); *see also Owens v. CEVA Logistics/TNT*, 2012 U.S. Dist. LEXIS 180866 (S.D. Tex. Dec. 21, 2012)("where an employee is primarily involved in producing the product of the company rather than 'servicing' the company, the administrative exemption does not apply")(citations omitted). In *Koehler*, the court stated that the defendant is a middle-man—it makes money when customers pay the defendant more than Defendant pays the carriers who actually transport the load. *Id*. at *50. The court focused on Truckload Coverage Specialists, whose principal function was to find a carrier and negotiate with it to move a truckload for a customer at the lowest possible cost. *Id*. at *58. The court held that "[b]ecause Truckload Coverage employees perform a core function of Freightquote's business, the

Court denies Freightquote's motion for summary judgment based on the administrative exemption." *Id*. at *64.  In reaching that conclusion, the court stated:

> Freightquote is in the business of connecting its customers with shippers.  By booking carriers to transport customers' loads, Truckload Coverage employees are necessary to produce the service that Freightquote provides.  This function is not accounting, marketing, or other typical administrative work "applicable to the running of any business."

*Id*. at *62, *quoting Davis*, 587 F.3d at 535.

Plaintiff worked for Defendant's Waste Services division.  That division's role is to broker and manage waste removal, transport, disposal, and/or recycling for its customers.  In essence, Defendant acts as a broker for its customers, endeavors to save the customer money with respect to its waste disposal costs, and then gets paid a commission on the money that is saved by the customer.  Plaintiff's job was to obtain and secure rates from waste haulers so that Defendant's customers' hauling costs were as low as possible, thus in turn generating revenue for Defendant in the form of commissions.  Plaintiff's job function was not accounting, marketing, or other typical administrative work "applicable to the running of any business."  Plaintiff's primary duty was not "directly related to the management or general business operations" of Defendant or its customers.  Rather, Plaintiff's primary duty was to engage in production functions, which the regulations specifically state are non-exempt duties.  In drawing a line between Defendant's production and administrative functions, Plaintiff's job clearly falls on the production side of that line.  Plaintiff's job was to "produce" the very service that Defendant provides.  Accordingly, and on this issue/element alone, Defendant cannot meet its burden on the applicability of the administrative exemption.

### B. Plaintiff's Primary Duty Did NOT Include the Exercise of Discretion and Independent Judgment with Respect to Matters of Significance

With regard to the third element of the administrative exemption, the phrase "discretion and independent judgment" must be applied "in the light of all the facts involved and in the particular employment situation in which the question arises." 29 C.F.R. §541.202(b). The term "matters of significance" refers to the level of importance or consequence of the work performed. 5 C.F.R. §551.206(a). Factors to consider when determining whether an employee exercises independent judgment and discretion with respect to matters of significance include, but are not limited to:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. §541.202(b); *Beauford*, 781 F.3d at 404.

The pertinent facts on this point are as follows:

- Plaintiff has no college degree.

- Plaintiff had little autonomy and was at the bottom of Defendant's organizational chart.

- Plaintiff did not manage or supervise any employees.

- Plaintiff did not assign work to other employees.

- Plaintiff was strictly supervised.

- Plaintiff did not have the authority to set the price for hauling, but rather was required to present pricing to the customer's store manager or corporate office for approval.

- In her deposition, Plaintiff testified that she did not have the ability to renegotiate or cancel award letters, and had to double-check with everybody else to make sure it was able to change.

- Plaintiff could not negotiate additional services (other than rates) on an account unless and until she received approval from a manager.

- While Plaintiff was given some discretion, it did not relate to "matters of significance" that would indicate that she was an exempt administrative employee.

Overall, Plaintiff's job duties were not highly sophisticated, and any discretion and independent judgment she may have exercised was not real and substantial. *See Beauford*, 781 F.3d at 405 (finding that administrative exemption did not apply where plaintiff had little autonomy, was at the bottom of the organizational chart, was strictly supervised, and had job duties that were not highly sophisticated). Plaintiff did not perform any of the types of duties that meet the factors set forth in the regulations. She did not have authority to formulate, effect, interpret, or implement management policies or operating practices. She did not carry out "major" assignments in conducting the operations of the business; in fact, she considered her role and her assignments to be minor in the overall scheme of Defendant's business. Plaintiff's work did not affect the Defendant's business operations to a substantial degree, and she did not have authority to commit Defendant in matters that have significant financial impact. Plaintiff did not have authority to waive or to deviate from established policies and procedures without prior approval, and she certainly did not have authority to bind the company on significant matters.

Regarding Plaintiff's overtime claims, Defendant's only defense on liability is the administrative exemption.  If and when the jury rejects the applicability of this exemption, the only remaining issues for the jury's determination will be the extent of Plaintiff's unpaid overtime damages.

Respectfully submitted,

**RIGGAN LAW FIRM, LLC**

  /s/  *Russell C. Riggan*
RUSSELL C. RIGGAN, #53060
SAMUEL W. MOORE, #58526
132 West Washington Avenue, Suite 100
Kirkwood, Missouri  63122
314-835-9100
314-735-1054 fax
russ@rigganlawfirm.com
smoore@rigganlawfirm.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The foregoing was served on opposing counsel of record via the Court's electronic filing system on the date reflected therein.

  /s/   *Russell C. Riggan*